IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2018

IN RE JARRETT P. ET AL.

Appeal from the Juvenile Court for Roane County
No. 2015-JC-60     Terry Stevens, Judge

_____

No. E2017-00373-COA-R3-PT
_____

In this action, the trial court terminated the appellant mother's parental rights to her three children upon the court's finding that clear and convincing evidence existed to establish the statutory grounds of (1) abandonment by willful failure to visit, (2) abandonment by willful failure to financially support, and (3) severe child abuse. The court also determined by clear and convincing evidence that termination was in the best interest of the children. The mother has timely appealed. Discerning no reversible error, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Darrell W. Sproles, Wartburg, Tennessee, for the appellant, April P.

Laura S. Hash, Knoxville, Tennessee, for the appellees, Heather S. and Terry S.

OPINION

I. Factual and Procedural Background

On March 27, 2015, the petitioners, Heather S. and Terry S. ("Petitioners"), filed a petition in the Roane County Juvenile Court ("trial court") seeking to terminate the parental rights of April P. ("Mother") to her three minor children: Jarrett, who was fourteen years of age at the time of trial; Kevin, who was seven years of age; and Sophia,

who was four years of age (collectively, "the Children").[1]  Mother is a resident of Alabama.  Petitioners, who are Mother's sister and brother-in-law, are residents of Tennessee.  Petitioners asserted that the Children had been in their legal and physical custody since May 2013, following Mother's incarceration for shoplifting.  Petitioners also stated in their petition that the Children had resided with Petitioners periodically throughout their lives when Mother was unable to care for the Children.

In the termination petition, Petitioners averred that following an emergency custody hearing, the Juvenile Court for St. Clair County, Alabama ("Alabama Court"), awarded temporary legal and physical custody of the Children to Petitioners, allegedly due to Mother's incarceration and allegations of domestic violence and illegal drug use in Mother's home.[2]  The Alabama Court entered a "Final Order of Custody" ("Alabama Final Order"), awarding Petitioners legal and physical custody of the Children on May 23, 2014.  The Alabama Final Order further awarded visitation to Mother as agreed upon by Petitioners.

Petitioners alleged in their termination petition the following statutory grounds for termination of Mother's parental rights:  (1) abandonment by willful failure to visit, (2) abandonment by willful failure to financially support, and (3) severe child abuse.[3]  Petitioners further averred that termination of Mother's parental rights was in the best interest of the Children.

With regard to the first ground, Petitioners alleged that Mother willfully abandoned the Children because she failed to regularly visit the Children for four months preceding the filing of the petition despite Mother's "ability and opportunity" to visit.  Petitioners acknowledged that Mother had exercised token visitation with the Children during the statutory period by visiting on one occasion in January 2015.  *See* Tenn. Code Ann. § 37-2-402(1)(C) (2014) (defining token visitation as "nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child").  Petitioners further alleged that Mother was not allowed contact with Jarrett per a March 2014 court order.[4]  Because Mother lived outside of Tennessee, Petitioners asserted that they offered to meet Mother halfway between Petitioners' home and Mother's home in Alabama for

---

[1] The parental rights of Kevin's and Sophia's father were addressed in a separate proceeding.  The record reflects that Jarrett's father is deceased.

[2] This ruling is reflected in the record by an order from the Alabama Court dated July 10, 2013.

[3] Petitioners further alleged the ground of persistence of the conditions leading to removal of the Children; however, they chose to voluntarily nonsuit this ground during trial.

[4] We note that no such order appears in the appellate record.

visitation on multiple occasions.  However, Petitioners claimed that Mother often cancelled visitation or "simply failed to show up."

With regard to the second statutory ground, Petitioners alleged that Mother failed to make payments toward the financial support of the Children for four months immediately preceding the filing of the petition despite having the ability to provide support.  Petitioners averred that through the Alabama Final Order, Mother was ordered to pay child support in the amount of $450.00 per month, commencing on September 1, 2013.  Petitioners alleged that Mother was jailed in November 2013 due to her failure to pay child support and failure to repay Social Security survivor benefits belonging to Jarrett after his father's death.  Petitioners asserted that Mother then paid $500.00 in child support in order to "get out of jail" and that Mother paid $700.00 in May 2014 in order to avoid subsequent incarceration for failure to pay support.  According to Petitioners, Mother had paid no support during the statutorily determinative period and was $7,900.00 in arrears on her child support payments.  Petitioners stated that Mother was employed and had the "ability, capability, means and opportunity to either provide support and/or to make reasonable payments toward the support of the children." Additionally, Petitioners alleged that Mother claimed the Children as dependents on her federal income tax returns while the Children were living with Petitioners.

With regard to the third ground, Petitioners alleged in their termination petition that Mother failed to protect the Children from severe child abuse.  *See* Tenn. Code Ann. § 37-1-102(b)(21) (2014) (defining severe abuse in pertinent part as a "knowing failure to protect a child from abuse or neglect.").[5]  Petitioners stated that Mother failed to protect Kevin from sexual abuse perpetrated by her live-in boyfriend, F.P.  Petitioners also asserted that Mother was present in the home on at least one occasion when F.P. allegedly sexually abused Kevin.  Furthermore, Petitioners alleged that Jarrett reported witnessing F.P.'s having taken Kevin into the bathroom and then hearing Kevin scream. In addition, Kevin reportedly disclosed to Petitioners "that [F.P.] had touched his genitalia by 'pulling and hurting' it."  Petitioners stated that the sexual abuse lasted from approximately November 2011 until the Children were removed from Mother's home in May 2013.

Petitioners also alleged that Mother had failed to protect Kevin from additional physical abuse by F.P.  Petitioners stated that Mother had called them in September 2012 "to come pick the children up because [F.P.] had bitten [Kevin]."[6]  Additionally,

---

[5] Effective July 1, 2016, the General Assembly amended this section, renumbering the definition of "severe child abuse," formerly codified at Tennessee Code Annotated § 37-1-102(b)(21), to Tennessee Code Annotated § 37-1-102(b)(22).  *See* 2016 Pub. Acts Ch. 979 § 4 (S.B. 2121).  In this Opinion, we will cite to the version in effect at the time the petition was filed in 2015.

[6] Petitioners alleged in the petition that Mother contacted Petitioners in September 2012.  However, the proof demonstrated and the trial court found that this event occurred in June 2012.

Petitioners claimed that Jarrett reported that F.P. "beat Kevin so badly that Jarrett could not wake Kevin up for an entire day." Petitioners emphasized that Mother continued to allow F.P. to babysit and live in the home with the Children despite Mother's knowledge of his abuse of the Children.

Finally, Petitioners alleged in the petition that it was in the best interest of the Children for Mother's parental rights to be terminated because "the physical environment of [Mother's] home is not healthy and safe, because there is criminal activity in the home, [and] because there is abuse of alcohol and controlled substances which could render [Mother] consistently unable to care for the children in a safe and stable manner." Petitioners alleged that since the Children had been removed, Mother failed to maintain meaningful contact with the Children, forgot their birthdays, failed to send gifts, and often made promises that she did not keep. Petitioners asserted that "the effect of a change of caretakers and physical environment is likely to have a serious, detrimental effect on the children's emotional and psychological conditions." According to Petitioners, Jarrett was in therapy to address the "trauma of what he had witnessed while in his Mother's care," and Kevin was also in therapy for the foreseeable future. Finally, Petitioners alleged that the Children had witnessed domestic violence, drug use, sexual activity, and criminal activity in Mother's home.

Mother filed a motion seeking dismissal of the termination petition on April 30, 2015, based on Petitioners' purported noncompliance with applicable statutory and procedural authority, failure to state a claim upon which relief could be granted, and improper venue. Mother alleged that in accordance with Tennessee Code Annotated § 36-1-113(d)(3)(B), the petition should be dismissed because the biological fathers were not listed as respondents. Mother further alleged that pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Tennessee Code Annotated § 36-6-201, *et seq.*, Alabama had continuing exclusive jurisdiction over the matter because there was a matter involving the Children currently pending in Alabama, Mother continuously resided in Alabama, and the allegations that served as the basis of the termination petition occurred in Alabama. However, on March 15, 2016, in response to a motion filed by Petitioners, the Alabama Court ordered that venue was proper in the Tennessee trial court and closed the matter pending in Alabama.

Petitioners filed an amended termination petition on April 1, 2016, asserting that they had requested searches of Tennessee's and Alabama's putative father registries. Petitioners did not allege any additional grounds for termination in the amended petition. On May 26, 2016, Mother filed an answer denying all substantive allegations and requesting dismissal of the petition due to, *inter alia*, lack of jurisdiction and improper venue.[7] Mother concomitantly filed a counter-petition with the trial court seeking restoration of custody.

---

[7] We note that neither party has raised an issue regarding jurisdiction or venue on appeal.

The trial court conducted a bench trial spanning six non-consecutive days on July 14, 2016; July 21, 2016; July 28, 2016; December 1, 2016; December 8, 2016; and January 12, 2017. Following the conclusion of trial, the court entered a final order on January 23, 2017, terminating Mother's parental rights to the Children. The court found by clear and convincing evidence that Mother had abandoned the Children by willfully failing to visit them and willfully failing to provide financial support for them for four months preceding the filing of the termination petition. The court also found that Mother knowingly failed to protect the Children from severe child abuse. Based on the evidence presented, the trial court determined by clear and convincing evidence that it was in the best interest of the Children to terminate Mother's parental rights. Mother timely appealed.

## II. Issues Presented

Mother presents four issues for our review, which we have restated as follows:

1.  Whether the trial court erred in determining by clear and convincing evidence that Mother had abandoned the Children by willfully failing to visit them during the determinative four-month period.

2.  Whether the trial court erred in determining by clear and convincing evidence that Mother had abandoned the Children by willfully failing to financially support them during the determinative four-month period.

3.  Whether the trial court erred in determining by clear and convincing evidence that Mother had knowingly failed to protect Jarrett and Kevin from severe child abuse.

4.  Whether the trial court erred by determining that it was in the Children's best interest to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *See In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are

reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky,* 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final and irrevocable*"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *

6

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Grounds for Termination

Tennessee Code Annotated § 36-1-113 (2014) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)  The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)  Termination of parental or guardianship rights must be based upon:

(1)  A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)  That termination of the parent's or guardian's rights is in the best interests of the child.

## A. Abandonment

The trial court found as grounds for termination that Mother had abandoned the Children by willfully failing to visit and financially support them. Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)  Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The

7

following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2014) defines abandonment in pertinent part as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to this statutory definition, the four-month determinative period for purposes of determining abandonment by willful failure to visit and willful failure to support with regard to the first petition for termination of parental rights began November 27, 2014, and concluded on March 26, 2015, the day prior to filing of the termination petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period ends on the day preceding filing of the termination petition). Although the trial court in its order mistakenly specified this period as ending on March 27, 2015, we determine that the inclusion of this additional day has no effect on the our analysis in this matter.

Pursuant to the statutory definition of abandonment, the trial court must find that a parent's failure to visit or support during the statutory period was willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

8

Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. Furthermore, failure to visit or support is not excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* In *Audrey S.,* this Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

This Court has often held that a parent's "demeanor and credibility as a witness also play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496, at *7 (Tenn. Ct. App. Mar. 27, 2012) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)). Furthermore, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." Incorporating the foregoing analysis, we shall review in turn each form of statutory abandonment found by the trial court.

### 1. Willful Failure to Visit

Mother asserts that the trial court erred by determining that clear and convincing evidence existed to terminate Mother's parental rights on the ground that Mother willfully failed to visit the Children during the determinative four-month period. Mother argues that her failure to visit the Children was not willful because the distance between Mother and the Children was a substantial hindrance. Mother further contends that she did not voluntarily relinquish custody of the Children, called the Children every day, attempted to see the Children, and tried to stay active in the Children's lives. Upon a thorough review of the record, we disagree and conclude that the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

The evidence demonstrated that Mother only visited the Children one time during the four-month determinative period. The trial court concluded in its final order that Mother's sole visit on January 8, 2015, was token visitation. According to Tennessee

9

Code Annotated § 36-1-102(1)(C), "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

The trial court made the following findings of fact in its final order with respect to Mother's failure to visit:

[Mother] did have a visitation for about 6 hours on January 8, 2015. The visitation itself was considered a good visit. However, the visitation was of a short period in time and was not enough to maintain the thread of a parent child relationship alone. Therefore, the Court finds that this one visit is clearly token visitation, as defined by Tenn. Code Ann. § 36-1-102(1)(C).

However, [Mother] claims that she failed to make any other visitations due to sickness and weather. She claimed possibly two visitations were interrupted by weather; although, aside [from] claiming it was in February, she did not give specific dates. She also claimed she missed some visitations due to sickness. She testified that she was sick for ten (10) days in January and a few days in February.

The Court does not give much weight to this defense. The weather days were referred to with no specificity leading the Court to believe that a visitation was not planned. There was no documentary proof of these illnesses that would show it arose to the level of preventing visitation. Further, [Heather S.] and [the maternal grandmother] testified that [Mother] has lied about being ill (with AIDS and Cancer) in the past, which both are untrue by the testimony of [Mother] herself.

If the Court gives [Mother] credit for two weeks of unavailability for sickness and/or weather, [M]other still had approximately 84 other days to visit the children. [M]other visited one time out of 84 opportunities which means she saw her children approximately one (1%) percent of the time available to her from November 2014 to March 8, 2015.

The Court finds that the limited telephonic communication and the lack of in person visitation is not enough to maintain the thread of the parent child relationship. The Court finds that visiting with the children for only 6 hours, at most, in a four (4) month span, which represents approximately one (1%) percent of the time available to [Mother,] is token visitation- as defined in Tenn. Code Ann. § [3]6-1-102(1)(C).

We note that although we review the trial court's findings of fact with a presumption of correctness, the trial court's conclusion that Mother's failure to visit constituted willful abandonment presents a question of law, which we review *de novo* with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810. We further acknowledge that "[a] parent cannot be said to have abandoned a child when [her] failure to visit . . . is due to circumstances outside [her] control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). However, a parent's failure to visit is not excused by someone else's conduct unless the conduct actually prevents the obligated person from visiting or "amounts to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Serre*, 665 N.E.2d 1185, 1189 (Ct. Com. Pl. 1996)). Additionally, any efforts made to visit a child after a petition to terminate parental rights has been filed do not negate or provide repentance for prior abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F); *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009).

In the present case, Mother argues that the distance between her home in Alabama and Petitioners' home in Tennessee was a substantial hindrance to visitation. However, Heather S. testified and Mother acknowledged that they had made plans to meet in Chattanooga, the half-way point between Mother's home and Petitioners' home, for visits when Mother could not travel to Petitioners' home. Heather S. stated that she offered to meet Mother in Chattanooga in order to accommodate visitation because Mother "said she didn't have the gas to come all the way." Despite this accommodation, Mother still failed to exercise visitation with the Children. Moreover, Heather S. and Jarrett both testified that there were "one or two times that [Mother] didn't show up" while Heather S. and the Children were waiting for Mother in Chattanooga.

Heather S. testified that she never refused visitation to Mother during the four months prior to the filing of the termination petition apart from Christmas Day, when the family had other plans, and New Year's Eve, when Terry S. had a previously scheduled surgical procedure. The trial court found this statement to be credible while determining that Mother's claims regarding illness and weather were not credible.[8] Heather S. also testified that Mother did not request any other visits during the statutorily determinative period. Based on the evidence presented, we determine Mother's argument that she was prevented from visiting due to distance to be unavailing.

Mother similarly argues that her poor relationship with Heather S. hindered visitation. Mother testified that Heather S. would not answer her phone calls. However,

---

[8] We emphasize that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones*, 92 S.W.3d at 838.

Heather S. disputed this assertion. Despite Mother's complaints concerning her relationship with Heather S., the proof is undisputed that Heather S. was willing to accommodate Mother's visitation by traveling to Chattanooga with the Children. It is further undisputed that Mother only sought two visits during the four months preceding the termination petition's filing that were denied by Petitioners due to pre-existing family plans and a scheduled surgery. Mother was unable to demonstrate that she had any other visits planned during the determinative time period. Therefore, the evidence did not demonstrate that Heather S.'s conduct "amount[ed] to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *See In re Audrey S.*, 182 S.W.3d at 864.

Mother presented no proof that Heather S. hindered her visitation with the Children. We note that despite Heather S.'s willingness to travel to Chattanooga to facilitate visitation, there was more than one occasion that Mother did not show up to Chattanooga for visitation, leaving the Children waiting and causing Heather S. to travel unnecessarily. Having carefully reviewed the evidence, we conclude that the poor relationship between Heather S. and Mother did not prevent Mother from visiting the Children or amount to a significant restraint on Mother's ability to visit.

Mother also asserts that she did not willfully abandon the Children because she did not voluntarily relinquish custody, still showed interest in the Children, and had tried to regain custody of the Children. However, the trial court made the following relevant findings of fact regarding Mother's communication with the Children:

> Jarrett cut off communication with [Mother] approximately a year ago. He testified this was his decision.

> Contact was ended with Kevin by court order upon testimony, by Heather [S.] and Mary Helen Lyle-Joiner, that after a telephone conversation in April 2016, for his birthday, that Kevin started to display increased regressive and sexualized behavior. Mary Helen Lyle-Joiner, an undisputed expert in child counseling, testified that the conversation with [M]other was a trauma trigger, and it was in the best interest of Kevin to cease communication. This determination was made, because after the conversation with [Mother], Kevin became hyper-focused and scared. Mary Helen Lyle-Joiner stated it took several weeks, including therapy, for Kevin to stop showing sexualized behavior.

> [Mother] maintained some phone conversations with Sophia and saw her when she would come to court dates.

Our thorough review of the evidence does not support Mother's argument that she has attempted "to stay active with what's going on" in the Children's lives. Heather S.

testified that Mother's interest in the Children and their activities was sporadic at best. She and Jarrett both stated that Mother had been informed regarding Jarrett's extracurricular activities, such as football and basketball games but that Mother failed to attend. As Heather S. characterized the situation, Mother would often promise that she would come but would instead provide excuses and fail to appear.

In support of Mother's argument that she did not consciously disregard the Children, Mother asserts that she filed a pleading in the Alabama Court to regain custody of the Children. Mother also testified to this fact at trial. Mother argues that the filing of such a pleading demonstrates she "has not consciously disregarded her role as mother to her children." We note, however, that Mother's petition was filed on April 24, 2015, after the filing of the instant termination petition.

The trial court found that Mother's testimony was not credible and that "the limited telephonic communication and the lack of in person visitation is not enough to maintain the thread of the parent child relationship." Thus, the trial court found by clear and convincing evidence that Mother willfully failed to visit the Children for four months preceding the filing of this action. We agree.

As the trial court found, Mother had ample opportunities to visit the Children during the statutorily determinative period even when limited times of purported illness or bad weather are considered. Mother presented no justifiable reason for her failure to avail herself of visitation opportunities. Moreover, Heather S. demonstrated a willingness to accommodate Mother by traveling to Chattanooga to meet her, but Mother failed to appear. Based on our thorough review of the evidence presented, we conclude that the trial court did not err in terminating Mother's parental rights based on her willful failure to visit the Children.

## 2. Willful Failure to Support

Mother contends that the trial court erred by finding that she willfully failed to financially support the Children. Mother asserts that because she paid $3,220.00 in April 2015 toward child support, she did not display the actions of a parent that shows "absolute, complete and intentional relinquishment of all parental control and interest." *O'Daniel v. Messier*, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995). We note, however, that *O'Daniel v. Messier* was legislatively overruled, effective January 1, 1996, by Tennessee Code Annotated § 36-1-102(1)(G), which states:

> "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section . . . . Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a

determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.

*See In re Swanson*, 2 S.W.3d 140, 184-85 (Tenn. 1999). We further note that Mother's payment came after the filing of the termination petition and not within the statutorily determinative period. *See* Tenn. Code Ann. § 36-1-102(1)(F) (providing that abandonment may not be repented of by paying support subsequent to the filing of the termination petition).

Regarding Mother's nonpayment of support for the Children, the trial court stated in pertinent part:

> Child support was set at $450 per month by the [Alabama Court]. There is no dispute that all parties were aware of this support obligation. In fact, [Mother] was jailed in 2013 for failure to pay this child support obligation.
>
> [Mother] testified that she is able bodied, except when ill, has always maintained a job, makes approximately $15.00 per hour and works anywhere from 20-40 hours a week (and has even worked 16 hour shifts). Her yearly income was $20,000 to $25,000 for the years preceding 2015, in which she made $30,000. However, no child support, in the time period of November 26, 2014 to March 27, 2015, was paid.
>
> In the case at hand, [Mother] claims she did not have the ability to pay, and therefore, the lack of child support payments was not willful. [Mother] testified that she did not have the ability to pay due to sickness, which the Court does not give much weight due to credibility issues as to the timing and duration of said illness, as detailed in the findings of fact.
>
> However, [Mother] testified that she was sick for only approximately fifteen (15) days during the relevant time period. Further, she testified that her brother helped her with her household expenses in that time.
>
> Within a few weeks of the filing of the termination of parental rights petition, [Mother] made a lump sum payment of $3220.00. She testified that she had been saving up, and this money was not from an income tax return. When asked why she had not paid beforehand, she testified the combination of having to keep up a home for the kids to return to and not being able to see the kids is why she did not pay.

14

The Court finds that [Mother] did have the ability to pay some, if not all of the court ordered support. In support thereof, [Mother] paid more than the amount owed in child support for the relevant time period within weeks of the termination of parental right petition being filed, from money that she had been saving up.

The evidence demonstrates that although Mother was ordered to pay $450.00 per month commencing in September 2013 by the Alabama Court, Mother did not make any child support payments during the statutorily determinative period. Mother acknowledged during trial that she was aware of her duty to support the Children. As the proof demonstrated, Mother was jailed for failure to pay child support in November 2013. Mother testified that she did not make a child support payment until December 2013, after she was jailed, when she paid $500.00. In January 2014, Mother paid $600.00, and in April 2014, Mother paid $700.00. Mother did not make any additional payments in 2014. Mother's next child support payment was in April 2015, following the filing of the termination petition. Ergo, it is undisputed that Mother made no child support payments during the four-month period of November 27, 2014, to March 26, 2015.

Having determined that Mother failed to financially support the Children, we must also determine whether clear and convincing evidence supports the trial court's finding that Mother's failure to support the Children was willful. Merely demonstrating that a parent did not support his or her children financially during the statutorily determinative period is not sufficient to prove this ground. *See In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004). As previously explained, failure to support is willful when a parent is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. It is often necessary for the trial court to consider circumstantial evidence when determining a parent's intent. *See id.* at 864.

As this Court has elucidated:

[T]he element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child

15

when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d [636,] 640 [(Tenn. 2013)] (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. Mar. 16, 2015).

Mother argues that her failure to support the Children was not willful because she "has shown a conscious regard to maintain the relationship between parent and the child." The trial court found in relevant part regarding Mother's willfulness in her failure to financially support the Children:

> In the case at hand, [Mother] claims she did not have the ability to pay, and therefore, the lack of child support payments was not willful.
>
> * * *
>
> The Court finds that [Mother] did have the ability to pay some, if not all of the court ordered support. In support thereof, [Mother] paid more than the amount owed in child support for the relevant time period within weeks of the termination of parental right petition being filed, from money that she had been saving up.

At the beginning of the termination trial, Mother admitted that she had not paid child support, at least in part, because she "had hard feelings about not being able to see [the Children]." However, during a subsequent hearing Mother contradicted her earlier testimony and claimed that she had not paid child support because she was financially unable. Mother testified that she brought Valentine's Day gifts and Easter baskets to the Children when she visited them after this petition was filed. However, those gifts were made outside of the statutory period and thus are not considered in our review. Mother did not dispute that she was gainfully employed during the statutorily determinative period, earning $15.04 per hour and working twenty to forty hours per week. Mother originally testified that she had the means to make the $3,200.00 payment following the termination petition's filing because she did not previously pay child support and had been "saving up." Mother later recanted this testimony, however, claiming that she was only able to make the lump-sum payment because she had received a federal income tax refund.

Mother further acknowledged that the Alabama Court had held her in contempt because she received and withheld Jarrett's Social Security survivor benefits, which he received due to the death of his father. The Alabama Court ordered Mother to reimburse

Jarrett. Additionally, Mother admitted to claiming the Children as dependents on her federal income tax returns in 2013 and 2014 despite not having custody of them. Mother testified that she received approximately $5,000.00 from her tax refunds in both 2013 and 2014.

The trial court found that Mother possessed "the ability to pay some, if not all of the court ordered support." We agree. Mother testified that she was employed and earned income during the four months preceding the termination petition's filing. Mother indicated that she also received financial assistance from her brother during that time, and her brother corroborated that testimony. As the trial court noted, Mother's initial testimony that she was able to make a large, lump-sum payment following the filing of the petition from money she had been "saving up" is telling, despite her later attempts to recant this testimony. We conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother willfully failed to provide financial support for the Children despite having the ability to pay support. We therefore affirm the trial court's reliance upon this statutory ground for termination.

B. Severe Child Abuse

Mother also argues that the trial court erred in finding by clear and convincing evidence that Mother severely abused Jarrett and Kevin. With regard to this ground, Tennessee Code Annotated § 36-1-113(g)(4) provides:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(21) (2014) states in pertinent part:

> "Severe child abuse" means:
>
> (A)(i)  The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii)  "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

17

(B)     Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C)     The commission of any act towards the child prohibited by § 39-13-309, §§ 39-13-502 – 39-13-504, § 39-13-515, § 39-13-522, § 39-15-302, § 39-15-402, or § 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child . . . .

In its final order terminating Mother's parental rights, the trial court found:

[Mother] allowed an unmarried, unrelated man ([F.P.]) [to] reside in her home. He was allowed to bathe Kevin and Sophia [P.]. He beat and bit Kevin to the point that [Mother] called [Heather S.] to come get the boys (Jarrett and Kevin) in June 2012, because Kevin could not go to day care. When confronted about the degree of this physical abuse, [Mother] stated [F.P.] was made to move out. When confronted with sexualized behaviors Kevin was demonstrating, [Mother] stated [F.P.] was made to move out. However, [F.P.] was present when [Heather S.] returned to the apartment of [Mother] to get belongings of the children in May 2013.

The Court finds that as of June 2012 [Mother] was aware of the abuse caused by [F.P.] to her children. He severely beat and bit Kevin but was allowed back in the home. He was then allowed unfettered access to her children. She would leave at unusual times, [F.P.] would hold Jarrett down and molest him, and [Mother] would return just after the abuse ended. He would molest Kevin in the living room and the bathroom, while she was at home. Per the testimony of Jarrett, one could hear what was going on in another room of the apartment from any other room in the apartment.

* * *

Based on the totality of the circumstances surrounding the physical and sexual abuse suffered by both Jarrett and Kevin [P.], the Court finds by clear and convincing evidence that [Mother] knowingly failed to protect Jarrett and Kevin [P.] from the brutality and abuse inflicted upon them by [F.P.].

Mother argues on appeal that the trial court erred in terminating her parental rights because the evidence preponderates against the finding of severe child abuse. Specifically, Mother argues that she was never aware of the abuse and that the trial court thereby erred in finding that Mother knowingly failed to protect Kevin and Jarrett. In support of her argument, Mother relies on this Court's decision in *In re Devonta L.C.*, which states in relevant part:

> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re Devonta L.C.*, No. E2012-00678-COA-R3-PT, 2013 WL 395977, at *6 (Tenn. Ct. App. Jan. 31, 2013) (quoting *In re S.J.*, 387 S.W.3d 576, 592 (Tenn. Ct. App. 2012)).

The trial court specifically found that Mother was aware of physical abuse as early as June 2012 because Mother told Heather S. that F.P. had hit and bitten Kevin and because Mother had sent Heather S. pictures of the bite marks and bruising, which pictures were introduced as exhibits at trial. Heather S. testified that the bruising was widespread and significant, and her mother, Kathy M. ("Grandmother"), corroborated this testimony, having witnessed Kevin's bruising after Heather S. picked him up. Jarrett testified that F.P. "whooped" Kevin with a leather belt, causing the bruises described by Heather S. and Grandmother. According to Jarrett, Kevin screamed and cried when this incident occurred. Jarrett further explained that Mother was in the home when F.P. struck Kevin and that Mother saw the resultant bruises and discounted the event as "regular discipline." Jarrett stated that Kevin received such whippings on a regular basis. Jarrett also testified that F.P. was "not nice" to him and would often push him or hit him with a closed fist when he was ten or eleven years of age, hurting and bruising him as well.

In addition to the physical abuse, Jarrett testified that F.P. sexually assaulted both Kevin and him in Mother's home. Jarrett stated that Mother often left them with F.P. for days at a time. Jarrett described in great detail instances wherein F.P. physically restrained and molested him. According to Jarrett, this abuse continued for more than a year. Although Jarrett acknowledged that he did not tell Mother of his abuse, he opined that she seemed aware because she would leave the home at odd times, the abuse would occur, and then she would return shortly after the incident ended. Jarrett stated that Kevin also reported to him that F.P. touched Kevin's "privates," sometimes while F.P. was bathing Kevin. Jarrett stated that he never reported the abuse because Mother had warned him that reporting things to the Alabama Department of Human Resources would result in the Children's placement in foster care.

19

Heather S., Grandmother, and Ms. Lyle-Joiner corroborated Kevin's and Jarrett's disclosure of physical and sexual abuse. Heather S. presented the photographs that Mother sent her in June 2012 of Kevin's bruising and bite marks. Heather S. explained that Mother asked her to take Kevin for a while because she was afraid that Kevin's daycare would report the abuse to authorities. Heather S. stated that the Children later returned to Mother's home because Mother told her F.P. was no longer living there. However, according to Heather S., F.P. was present in the home when she picked the Children up in May 2013.

Heather S. reported that after the Children came to her home in May 2013, Kevin immediately began exhibiting sexually inappropriate behavior. Heather S. testified that when she confronted Mother about Kevin's behavior, Mother stated that she had suspected that F.P. was abusing the Children and that was the reason she had expelled him from the home.

Mother testified during trial that she was unaware of the child abuse despite having "good touching, bad touching" conversations with the Children "every once in a while." Jarrett testified that no such conversations took place. In support of Mother's argument, Mother cites Jarrett's testimony at trial that he did not tell Mother about the abuse. The trial court, however, found in pertinent part:

> Kevin disclosed, to Mary Helen Lyle-Joiner, that [Mother] and [F.P.] would chase him around, hurt him and make him drink things that made him feel funny. Jarrett testified he was not sure if his mom knew of the abuse he was suffering, but she would leave at unusual times, the abuse would occur and she would return just after it stopped.

> [Mother], per Mary Helen Lyle-Joiner, is a trauma trigger for Kevin, which caused him to display regressive and sexualized behaviors. Mary Helen Lyle-Joiner testified that she would find it hard to believe that, considering the abuse disclosed to her by Jarrett and Kevin, [M]other would not be able to pick up on what was going on in her home.

Accordingly, in its final order, the trial court found by clear and convincing evidence that Mother severely abused Jarrett and Kevin pursuant to Tennessee Code Annotated § 37-1-102(b)(21).[9]

Following our thorough review of the record, we determine that the evidence supports the trial court's determination regarding the ground of severe child abuse. Heather S. testified that Mother sent her text messages in June 2012 with photographs of

---

[9] Although the trial court cited Tennessee Code Annotated § 37-1-102(b)(2)(A)(iii), it is clear that the court relied upon Tennessee Code Annotated § 37-1-102(b)(21).

bite marks and bruises on Kevin's leg. The photographs were introduced as a trial exhibit. Furthermore, Heather S. testified that Mother told her at that time that F.P. "had bit Kevin and he had beat him with a belt and [Mother] could not take Kevin to daycare because [Mother] was afraid they would call [the Alabama Department of Human Resources]." Jarrett corroborated Heather S.'s testimony and testified that he witnessed F.P. "[get] a belt and whoop[] [Kevin]." Jarrett further testified that Mother noticed Kevin's bruises but "brushed it off like it was just a regular . . . discipline." Grandmother testified that she also witnessed the bruising and that Kevin told her that F.P. had hurt him.

Mother denied any knowledge of child abuse. However, she did not attempt to explain the photographs of Kevin's injuries except to deny having sent them. Jarrett specifically testified that Mother's home at the time was small and that Mother would have heard Kevin's screams when Kevin was assaulted by F.P. Mother admitted to entrusting F.P. with the Children's care while she worked twelve-hour shifts and affirmed that he was permitted to bathe Kevin and Sophia. Based on our thorough review of the evidence, we conclude that the trial court was presented sufficient evidence that Mother had knowledge of the ongoing severe child abuse suffered by Jarrett and Kevin while they were in her custody.

Ms. Lyle-Joiner, as Kevin's and Jarrett's therapist, testified that she had diagnosed Jarrett with post-traumatic stress disorder. Ms. Lyle-Joiner explained that one of the underlying factors contributing to Jarrett's diagnosis was his reported sexual abuse by Mother's boyfriend. According to Ms. Lyle-Joiner, Jarrett had reported to her that he believed Mother was aware of the abuse. Ms. Lyle-Joiner opined that it would not be unusual for a child in Jarrett's situation to testify at trial, when having to face the allegedly offending parent, that the parent was not aware of the abuse. Further, Ms. Lyle-Joiner testified that the abuse Jarrett endured could be reasonably expected to produce severe psychosis, a severe neurotic disorder, severe depression, and severe impairment of his ability to function adequately in his environment. She related that Jarrett struggled to form healthy interpersonal relationships but was now getting the support he needed in order to improve.

With regard to Kevin, Ms. Lyle-Joiner testified that she diagnosed him with post-traumatic stress disorder as well. Ms. Lyle-Joiner related that Kevin disclosed to her that Mother's boyfriend sexually abused him and that the abuse Kevin endured was reasonably expected to produce severe neurotic disorder, severe depression, and developmental delays, the latter of which she had observed in Kevin. Furthermore, Ms. Lyle-Joiner opined that Kevin and Jarrett would likely struggle with behavioral, relationship, and personality issues for the foreseeable future.

Ms. Lyle-Joiner's testimony presented clear and convincing evidence that Jarrett and Kevin suffered from severe depression and/or severe impairment of their ability to

function due to the abuse they endured while in the custody of Mother. *See* Tenn. Code Ann. § 37-1-102(b)(21)(B) (defining severe child abuse as "brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression . . . or severe impairment of the child's ability to function adequately in the child's environment"). We therefore conclude that the trial court properly terminated Mother's parental rights to the Children based on the statutory ground of severe child abuse. *See* Tenn. Code Ann. § 36-1-113 (g)(4) (providing that termination may be based upon a finding by the trial court that the parent committed severe abuse against a child or that child's sibling or half-sibling).

## VI.  Best Interest of the Children

Mother argues that the trial court erred by determining that terminating her parental rights was in the best interest of the Children. When a parent has been found to be unfit by the establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d at 254). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

When making a determination concerning best interest, Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration by the trial court:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently elucidated regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of ground for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).

Facts considered in the best interests analysis must be proved by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case at bar, the trial court determined that Petitioners presented clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. We agree. Considering the above-listed factors, we determine that the first two factors do not necessarily militate in favor of termination because Mother presented some evidence at the time of trial that she was clean and sober, was working

regularly, and had obtained a suitable home. The remaining factors, however, weigh heavily in favor of terminating Mother's parental rights to the Children.

With regard to the third factor, the evidence demonstrated that Mother had failed to regularly visit and maintain contact with the Children. Although Mother visited the Children sporadically before the statutorily determinative period, Mother only visited the Children once during the four months prior to the filing of the termination petition. As a result, Heather S. and other witnesses opined that no meaningful relationship existed between Mother and the Children, as relevant to factor number four. Rather, Heather S. characterized Jarrett and Kevin as traumatized by contact with Mother and Sophia as viewing Mother as a "friend." Jarrett testified unequivocally that he did not want to see Mother because doing so caused him to recall "bad memories." Additionally, Ms. Lyle-Joiner testified that Kevin told her that "he did not want to go back [to Mother's home], he did not want to see [Mother], [and] he did not want to speak to her."

Concerning the fifth factor, the trial court found that it would be traumatic to remove Jarrett and Kevin from Petitioners' care and physical environment. Similarly, the court found that the Children were likely to be harmed if they were returned to Mother's custody. The trial court relied heavily on Ms. Lyle-Joiner's testimony as support for this determination. Notably, Ms. Lyle-Joiner testified that Mother was a "trauma trigger" to Kevin because he exhibited regressive and sexualized behaviors after contact with Mother. Jarrett testified that he felt safe living with Petitioners and desired no contact with Mother. The proof demonstrated that the Children were doing well with Petitioners. Jarrett and Kevin were happy in Petitioners' home, and Petitioners were providing for their needs, including therapy. There was also evidence that Petitioners were the only parents Sophia had known because she was of such a young age when she came to live with Petitioners.

The trial court accordingly emphasized that Sophia was "strongly bonded" with Petitioners and with her brothers. Furthermore, the trial court emphasized Ms. Lyle-Joiner's testimony that Jarrett and Kevin would be harmed if they were returned to Mother's custody. Heather S. testified that when the Children were placed into Petitioners' custody, Kevin was displaying significant behavioral issues. Heather S. also reported that Kevin and Sophia were hoarding food and eating out of trash cans and that it required a significant amount of time for them to cease these behaviors after entering Petitioners' home. Similarly, Ms. Lyle-Joiner testified that Kevin experienced regressive and sexualized behavior after contact with Mother. Ms. Lyle-Joiner stated that when she saw Kevin after he had a telephone conversation with Mother, "[h]e had regressed. He was rolling around on my floor. He was sucking his thumb. He was playing with his private parts. He has a little stuffed animal . . . and he was punching it . . . he was just hyper-focused and scared." Based on the evidence presented, we agree that a change of caretakers would be detrimental to the Children's emotional health. Heather S. testified that Petitioners plan to adopt the Children.

With regard to the Children's experiences when living in Mother's home, in addition to the disclosures of physical and sexual abuse, Jarrett testified during trial that they often did not have food to eat and that Mother refused to cook for them. Jarrett described observing Mother and F.P. take pills that made them seem "lazy" or "sleepy" and watching F.P. smoke marijuana. Jarrett described parties in Mother's home wherein people would drink alcohol until they passed out and the Children would be left to themselves, sometimes staying up half the night. Jarrett further testified that he had observed Mother shoplift on multiple occasions and that Mother forced him and Kevin to steal items as well.

According to Jarrett, Mother allowed another male named "Darius" to live in the home, and Darius, F.P., and Mother all slept in the same bed. Jarrett also described observing Darius sell drugs to third parties while Mother and the Children were in the car. Heather S. also reported seeing illicit drugs in Mother's home when she picked up the Children in May 2013 after Mother was arrested for shoplifting.

Heather S. testified at length regarding Mother's circumstances in support of her assertion that Mother failed to maintain a suitable home for the Children prior to their removal. Heather S. testified that the Children lived with her "on and off" throughout the years when Mother could not care for them, that Mother had substance abuse problems, that the Children were not regularly taken to a pediatrician, and that there was drug use in the home. Although Mother denied that her home had been unsuitable, Mother acknowledged that F.P. was often under the influence of marijuana around the Children. Mother also acknowledged that she was guilty of shoplifting. Although Mother argues that she made an adjustment of her circumstances and that F.P. no longer lives with her, Heather S. testified that F.P. was in Mother's home when she picked up the Children in May 2013.

Concerning the remaining statutory factors, the evidence presented at trial demonstrated that Mother had a history of domestic violence in her home and that one incident resulted in the incarceration of her boyfriend. In addition, Mother testified that Sophia's and Kevin's father physically abused her and threw her down the stairs while she was pregnant with Sophia. Additionally, although Mother passed several drug screens prior to trial, Jarrett and Heather S. testified to witnessing the use of drugs and the presence of drugs and drug paraphernalia in Mother's home. Based on the evidence presented, it is clear that Mother had not demonstrated that she could care for the Children in a safe, stable manner.

In reference to factor nine, although Mother paid child support after the filing of the instant termination petition, Mother paid sporadically in 2014 and did not financially support the Children at all during the statutorily determinative period. Mother has never

regularly paid child support as ordered by the Alabama Court despite maintaining consistent employment.

Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. We therefore affirm the trial court's termination of Mother's parental rights.

## VII. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court terminating the parental rights of Mother in all respects. Costs on appeal are taxed to the appellant, April P. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

27